# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Frederick J. Kapala | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 CR 50034 | **DATE** | 9/23/2010 |
| **CASE TITLE** | United States v. Puckett, et al. | | |

**DOCKET ENTRY TEXT:**

Defendants' motions to quash arrest and suppress evidence [50] [56] are denied.

■[ For further details see text below.]

Docketing to mail notices.

## STATEMENT

Defendants, Osic Puckett and Troy Neely, are charged with possession of more than 100 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1). Defendants filed motions to quash arrest and suppress all physical evidence obtained as a result of the execution of a search warrant for a shipping container, the arrest and search of defendants' persons, the search of a U-Haul van, and the search of the residence at 1524 Rose Avenue, Rockford, Illinois. The parties have briefed the motion and the court has held an evidentiary hearing. For the reasons that follow, defendants' motions are denied.

### I. FINDINGS OF FACT

At the evidentiary hearing, Rockford Police Department Detective Robert Reffett testified that Sergeant Holevis, of the Sauk Village Police Department, informed him that on July 19, 2009, personnel at ABF Freight reported that they smelled a strong odor of cannabis coming from a shipping container. Two Sauk Village officers went to the ABF facility and also smelled a strong odor of cannabis coming from the container. The Sauk Village K-9 officer "hit on" the container indicating the presence of marijuana. Sauk Village officers obtained a search warrant for the container and discovered that it held 505 pounds of cannabis in green bundles within seven cardboard boxes. The container originated in Phoenix, Arizona and was addressed to "Johnny Stamps" at 3801½ Crowley Street, Rockford, Illinois.[1] Detective Reffett and Deputy Boomer took custody of the container and transported it to Rockford. A field test performed on one of the packages was positive for the presence of cannabis.

Reffett testified further that he and other officers arranged to make a controlled delivery of the container to 3801½ Crowley Street including the use of a remote video surveillance system. On July 24, 2009, at approximately 8:55 a.m., Reffett and an ABF driver arrived at 3801½ Crowley Street with the container. Prior to Reffett's arrival, Sergeant Burke had contacted Reffett and told him that two pickup trucks had arrived at the Crowley Street property, one licensed to Puckett and one to Eugene Leach. When Reffett exited the semi-truck, he was met by Leach. Reffett told Leach that he had a delivery for 3801½ Crowley Street. Leach said they had been waiting for the delivery and he signed the shipping document "J. Stamps." The ABF driver unloaded the shipping container off the truck. As Reffett and the ABF driver left, Reffett observed Neely and Puckett

approaching in a white U-Haul van. Later, when Reffett arrived at 1524 Rose Avenue, the location to which the surveillance units followed the U-Haul van, he observed an officer bringing Puckett from the front door area out into the yard and saw Neely on the floor in handcuffs just inside the front door. Reffett and four or five other officers conducted a 30-second protective sweep of the interior of the residence to make sure no one else was present, and then came out and secured the residence. When asked why he was concerned that there might have been other people in the residence, Reffett said:

> With the investigation that we were doing, we knew that we had a substantial amount of cannabis inside the residence. This wasn't a small dime bag search warrant or anything like that. We knew that this was on a larger scale and more serious scale. When we approached the residence, Mr. Neely was still inside the residence. He still had to be secured by officers. However, at the time he had gotten down on the floor, we still wanted to be safe in our actions, make sure there's nobody else in there that's going to come out from a bedroom or a closet or a door or something with a weapon or anything like that while we're dealing with Mr. Neely. That's why protective sweeps are done, for basically officer safety.

Reffett also said that in his experience, firearms often accompany large marijuana distribution operations and that they were also concerned about the possible destruction of evidence. After exiting the residence, Reffett spoke to Neely and obtained his consent to search the U-Haul van, but not the residence. Neely told Reffett that the residence belonged to Chris Williams. Reffett telephoned Williams, asked him to come to his residence, and allowed Neely to speak to Williams. Reffett left 1524 Rose Avenue before Williams arrived.

      Deputy Robert Juanez testified that he was on the front porch of 1524 Rose Avenue when Deputy Chief Iasparro and DEA Agent McGovern knocked on the door. Juanez had his hand on his gun but did not have it drawn. Juanez did not see Iasparro or any other officer draw his gun. Juanez looked through the glass window on the front door and saw Puckett coming toward the front door. Iasparro asked Puckett to open the door. Puckett opened the door and stepped out onto the front porch. Juanez did not remember whether there was a screen door. Puckett was not ordered to get down on the floor, rather, Juanez escorted Puckett to the grassy area in front of the residence. The other officers were talking to another person inside the residence, but Juanez did not see where that person was located.

      Juanez testified further that when Williams arrived at 1524 Rose Avenue, Juanez identified himself and asked Williams if he was told what was going on at his residence. Williams said yes, that he had been taking to Detective Reffett on the telephone. While they were still outside of the residence, Juanez gathered general information from Williams before asking him for his consent to search the residence. Williams said that he had no problem with them searching, that he had nothing to do with what was at the residence, and he had nothing to hide. Juanez said Williams was nervous, but very cooperative. Juanez filled out a consent to search form, explained it to Williams, and asked Williams to read it before signing. Williams took the form, appeared to read it to himself, and then signed the form. Juanez said he and Williams spoke in calm voices the entire exchange. Juanez did not tell Williams that he had the right not to sign the consent form. Juanez remembered Williams asking if they had a search warrant, but did not remember Williams asking what would happen if he did not consent. Juanez denied telling Williams that Williams could not go into his residence if he did not sign the consent to search form. Deputy Mark Jurasek was present and confirmed that Williams gave consent to search the residence while Williams was outside the residence. After Williams asked if he could see the marijuana, Juanez and Jurasek took Williams inside the residence where Williams "kind of stuck his head inside the garage and looked around and then walked back out."

      Sergeant Randy Burke testified that he observed the U-Haul van arrive at the Crowley Street location through the video surveillance system. Burke watched the driver unlock the padlocks on the container, open the doors, and remove large cardboard boxes. The driver handed the boxes to the passenger who placed them in the

# STATEMENT

U-Haul van. Officers conducting surveillance watched the U-Haul van drive to 1524 Rose Avenue and pull into the attached garage. Berke observed Iasparro, Juanez, and McGovern knocking at the front door, announcing police, and telling them to open up the door. Berke did not recall anyone with his gun in his hand. A very short time later, the door was opened and Puckett voluntarily exited from the residence onto the front porch. Puckett was escorted from that point toward the front yard area. As Burke and other officers began to enter the residence, he saw Neely "proned out" on the inside of the residence just a few feet inside the residence. Burke then participated in a protective sweep of the residence which lasted less than one minute. After the sweep, all the officers exited the residence and it was secured. After the owner of the residence gave consent, officers reentered the residence and conducted a search.

Christopher Williams testified that he lives in the ranch-style house with attached garage located at 1524 Rose Avenue, Rockford, Illinois. The front interior door of the residence is made of wood and has a small frosted glass window. There is also an exterior screen door. The garage door on the attached-garage has windows that are covered with curtains. Williams has known Puckett and Neely for approximately 16 years and 18 years, respectively, and describes them as good friends. In fact, Williams agreed that Neely is his best friend. Williams has been involved with defendants in various business dealings over the years and has borrowed money from Neely on occasion for things like real estate investments and comedy show productions. Williams testified that Neely loaned him $1,000 and $3,000 on separate occasions and that he has not paid Neely back. Williams is and has been Neely's landlord since 2002.

Williams testified further that on July 24, 2009, he was at work when he received a telephone call from a police officer who informed him that defendants were at his residence with marijuana and that he needed to come home. At Williams' request, Reffett allowed Williams to speak to Neely, who informed Williams that he was in custody. With that, Williams drove home and observed some police officers standing outside his home. Williams said that the police officer who telephoned him earlier met him and asked him to come inside so that they could show him what they had. The officer brought Williams into the house and then into the garage where he showed Williams marijuana and a U-Haul van. According to Williams, while he and "maybe three other officers" were in the garage, an officer told him that he needed to sign a document in order for them to take the marijuana or the property would have to be secured, and he would not be able to come and go until they got a judge to sign a warrant. As a result, Williams signed a consent to a search of his residence. Williams explained that he did not want to sign the consent to search but that he felt like he had no choice because the marijuana was sitting in the garage and the police said they could not leave without it. Later in his testimony, Williams indicated that six or seven police officers had the opportunity to observe him being presented with the consent form in the garage.

Defendant Neely testified that on July 24, 2009, he and Puckett went to the Rose Avenue residence in a U-Haul van and parked it in the garage. After they unloaded boxes containing marijuana from the van, he and Puckett heard car doors slamming and people outside. Someone started banging on the windows and doors and said "open the door." According to Neely, Puckett observed that it was the police, and somebody inside the house opened the interior door. Once the interior door opened, the police entered with firearms in their hands and ordered Neely and Puckett to lay down on the ground inside the residence. Neely said that neither he nor Puckett opened the screen door to invite the officers inside the residence. Neely was taken outside, handcuffed, and placed inside a police car. Neely ultimately signed a consent to a search of the U-Haul van.

## II. ANALYSIS

Defendants contend that (1) the complaint/affidavit in support of the warrant to search the shipping container was insufficient to support a finding of probable cause and, therefore, all evidence seized as a result must be suppressed; (2) they were unlawfully arrested without a warrant within the Rose Avenue residence in violation of Payton v. New York, 445 U.S. 573 (1980); (3) the protective sweep of the Rose Avenue residence

# STATEMENT

was unlawful because the officers had no knowledge that anyone other than defendants were present in the house; and (4) the officers coerced Williams to sign a consent to search his residence.

## A. Search of Container

Defendants contend that the Sauk Village Police did not set forth facts in the affidavit that were sufficient to support a finding of probable cause and, as a result, any and all evidence discovered from the execution of the invalid search warrant must be suppressed. Specifically, defendants argue that the police failed to allege any facts in the affidavit that the officers, ABF employees or the K-9 unit had any training or experience in identifying marijuana odor, which is necessary to support a finding of probable cause. In response, the government sets forth three arguments: (1) defendants do not have standing to challenge the search of the shipping container because they did not have a subjective and objective expectation of privacy in the container; (2) the container was lawfully searched pursuant to a valid search warrant; and (3) the evidence should not be excluded because the police relied on the warrant in good faith when they searched the container.

The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Rakas v. Illinois, 439 U.S. 128, 143 (1978). Thus, the issue of whether a defendant has the ability to challenge a search or seizure is actually not an issue of standing but rather "is more properly placed within the purview of substantive Fourth Amendment law." United States v. Figueroa-Espana, 511 F.3d 696, 703 n.1 (7th Cir. 2007) (quotation marks omitted). This is because "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." Id. at 703 (quotation marks omitted). The test is whether defendant had a subjective and an objective expectation of privacy in the item searched. See id. at 704. A subjective expectation of privacy is one that defendant actually and subjectively held, while "[a]n objective expectation is one that society recognizes as legitimate and reasonable." Id. "[T]he individual seeking suppression of the evidence bears a burden to prove that he had a legitimate expectation of privacy in the searched property." United States v. Carlisle, ___ F.3d ___, 2010 WL 3155876, at *6 (7th Cir. Aug. 11, 2010).

In this case, there was no evidence presented that either defendant had a subjective or objective expectation of privacy in the shipping container. In their pre-hearing briefs, defendants asserted in conclusory fashion that they possessed a reasonable expectation of privacy in this container. However, these assertions are not supported by evidence. In his post-hearing memorandum, Puckett does not address the issue much less identify any evidence establishing that he had an expectation of privacy in the container. Neely did not file a post-hearing memorandum. Therefore, the court concludes that defendants have failed to establish a reasonable expectation of privacy in the shipping container sufficient to allow them to challenge the search of the container. Because defendants cannot validly assert a Fourth Amendment challenge to the search of the shipping container, the court does not reach the issue of whether the search was lawful or whether the good faith exception applies.

## B. Seizure of Defendants' Persons

Defendants contend that the police unlawfully entered the Rose Avenue residence without a warrant and arrested them in violation of Payton.[2] In response, the government argues that defendants were lawfully arrested. Because defendants were in different physical positions at the time of their respective arrests, the court will address their contentions separately.

Resolution of Puckett's contention requires the court to settle a factual dispute. Neely testified that neither he nor Puckett opened the screen door and that once the interior door was opened, the police entered with firearms in their hands and ordered Neely and Puckett to lay down on the ground inside the residence. If this is what transpired, Puckett's arrest was unlawful because the police must have an arrest warrant in order to enter a home to arrest a person within that home unless the they have consent or exigent circumstances exist. See Payton, 445 U.S. at 586-87; United States v. Jackson, 576 F.3d 465, 468 (7th Cir. 2009); see also Sparing v. Vill.

| STATEMENT |
|---|

of Olympia Fields, 266 F.3d 684, 690 (7th Cir. 2001) (holding that Payton applies where the arrestee stood inside his home behind his closed screen door).

In contrast to Neely's account, Sergeant Burke testified that Puckett opened the door and voluntarily exited the residence onto the front porch before being escorted to the front yard. Similarly, Deputy Juanez testified that Puckett opened the front door in response to the officers' knocks and stepped out onto the front porch. Juanez specifically testified that Puckett was not ordered to get down on the floor inside the residence. Under Juanez' and Burke's version, Pucket was voluntarily outside the residence when he was arrested and, therefore, the Fourth Amendment was not violated. See Maryland v. Pringle, 540 U.S. 366, 370 (2003) ("A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause.")

The court has observed the manner and demeanor of the witnesses while testifying at the evidentiary hearing on defendants' motions and has considered the witnesses' potential for bias and motives to fabricate. Based upon these considerations, the court credits the officers' testimony over that of Neely. The officers testified credibly and consistently that Puckett voluntarily emerged from the residence before being arrested. On the other hand, Neely's present predicament has provided him with a motive to fabricate and his recall of events, even as to simple matters such as who opened the interior door, was lacking. Therefore, the court finds no violation of the Fourth Amendment with regard to the arrest of Puckett.

Resolving Neely's contention is complicated by the fact that sparse evidence was presented at the hearing as to Neely's exact location when he was arrested. Neely did not indicate where exactly he was located when ordered to lay on the floor. Detective Reffettt said that he saw Neely in handcuffs "just inside the front door." Burke testified that when he entered the residence to do a protective sweep, he saw Neely proned out just a few feet inside the residence. Juanez provided no information as to Neely's location when arrested. If it is true that Neely was just inside the front door after Puckett had voluntarily opened the door, Neely's arrest may have been a lawful threshold arrest. See United States v. Santana, 427 U.S. 38, 42 (1976) (holding that a person standing in the open doorway of her home was in a public place, and not inside the home, for purposes of the Fourth Amendment, such that only probable cause was required for her warrantless arrest to be constitutional.); Sparing, 266 F.3d at 690 ("[I]f the police go to an individual's home without a warrant, knock on the door, announce from outside the home that the individual is under arrest when she opens the door to answer, and the individual acquiesces to a slight entry to complete the arrest, the entry is reasonable under the Fourth Amendment and consistent with Payton."). In any event, even if Neely was far enough behind the threshold to be considered inside the residence for Fourth Amendment purposes, and therefore not in a public place, for the reasons stated below, Neely was lawfully arrested while the officers were performing a protective sweep of the residence.

### C. Protective Sweep

Defendants argue that the protective sweep of the Rose Avenue residence violated their constitutional rights because it was based on an unlawful arrest, was not based on any articulable facts that would give rise to a reasonable belief that officer safety was at issue, and the police manufactured the exigency by waiting to arrest them until they were inside the Rose Avenue residence. In response, the government argues that the protective sweep was lawful because once defendants were arrested in the doorway, the agents were permitted to perform a protective sweep.

As explained in section B of this order, Puckett was lawfully arrested immediately outside the residence on the front porch after he voluntarily exited the house. The Seventh Circuit has stated, "cases that countenance protective sweeps when an arrest is made just outside the home do so on the theory that the officers are as much at risk from an unexpected assault on the defendant's doorstep as they might be inside the home." United States v. Arch, 7 F.3d 1300, 1303 (7th Cir. 1993). Therefore, the protective sweep was not based on an unlawful arrest.

# STATEMENT

The Court in Maryland v. Buie, 494 U.S. 325 (1990), identified two circumstances in which a protective sweep is permissible under the Fourth Amendment (1) officers may, "as a precautionary matter and without probable cause or reasonable suspicion, look in . . . spaces immediately adjoining the place of arrest from which an attack could be immediately launched," id. at 334, and (2) beyond immediately adjoining spaces where officers possess "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the area swept harbored an individual posing a danger to the officers or others." Id. at 327 (citation and quotation marks omitted).

The parties do not address the two distinct circumstances under which a protective sweep is authorized and the differing standards. As a result, there was little evidence presented at the evidentiary hearing explaining the floor plan of the Rose Avenue residence. Consequently, it is impossible for the court to determine, for example, whether the garage adjoined the area where Puckett was arrested. It is clear, however, that Neely was in an area adjoining the front porch where Puckett was arrested. "[T]he police may walk through rooms adjacent to the one in which they make an arrest, to ensure that no danger lurks within. The officers need not demonstrate any danger; they may look simply as a precaution." United States v. Brown, 64 F.3d 1083, 1086 (7th Cir. 1995) (citations omitted). As for areas beyond those immediately adjoining the area of arrest, the court is satisfied that the officers had "articulable facts which, taken together with the rational inferences from those facts . . . warrant[ed] . . . the officer[s] in believing that the area swept harbored an individual posing a danger to the officers or others." Buie, 494 U.S. at 327 (quotation marks and alterations omitted). Specifically, officers knew that Puckett and Neely had just picked up 505 pounds of marijuana with a conservative approximate street value of $ 505,000.[3] Reffett testified that in his experience firearms are often associated with the distribution of marijuana. Police also knew that at least one other individual was involved, Eugene Leach, and he was not accounted for. "[C]ourts have frequently upheld the use of the 'protective sweep' when the arrest was made in a place believed to be a major narcotics distribution or manufacturing point." Wayne R. Lafave, 3 Search and Seizure: A Treatise on the Fourth Amendment § 6.4 (4th ed. 2008); see also cases cited in n.69. It was therefore reasonable to conclude that such a valuable commodity would be guarded by armed conspirators who could be lurking somewhere within the residence, garage, or U-Haul van, and who presented a risk to the safety of the officers standing in front of the residence. Therefore, the officers' decision to conduct a protective sweep of the residence was reasonable.

Defendants also attempt to advance an undeveloped argument that the police manufactured the exigency, and therefore the protective sweep was unlawful. It is not clear what exigency defendants claim the police created. If the claim is that they should have arrested defendants before they went into the Rose Avenue residence, the claim fails because the police did nothing unreasonable in allowing the defendants to leave Crowley Street with the marijuana to see where or to whom they would take it. See Hoffa v. United States, 385 U.S. 293, 309-10 (1966) (holding that law enforcement agents are not obliged to make arrests as soon as possible; they may continue investigations in order to acquire additional evidence). Nor was there anything illegal in deciding to arrest defendants without a warrant if the opportunity to do so arose as a result of knocking on the door. See United States v. Collins, 510 F.3d 697, 700 (7th Cir. 2007) ("[T]here is no legal requirement of obtaining a warrant to knock on someone's door."). There was certainly no intent to create an emergency to circumvent the warrant requirement. In fact, no evidence that the police were not already aware of was discovered as a result of the protective sweep and police ultimately recovered the marijuana pursuant to the consent of the owner. Because the court has rejected all the arguments advanced by defendants in support of their contention that the protective sweep was unlawful, their motions cannot be granted on this basis.

### D. Consent to Search the Rose Avenue Residence

Voluntary consent is an accepted exception to the warrant requirement. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). "[T]he question whether a consent to search was in fact 'voluntary' or was the product

| STATEMENT |
|---|

of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Id. at 227. Defendants contend that Williams' consent was coerced and involuntary because (1) it was predicated upon the officers' earlier misconduct, and (2) Williams was told that if he did not consent, his residence would be sealed and he would not have access for an indefinite period. The government argues that Williams gave a knowing and voluntary consent to search his house.

Defendants' first argument is that officers used information obtained during the initial unconstitutional entry and protective sweep to coerce Williams' consent. This argument comes up short because this court has determined that the protective sweep was lawful. Moreover, the police did not gain new information as a result of conducting the protective sweep. Before obtaining Williams' consent, the officers informed Williams that there was a truck containing marijuana in his garage, a fact police were well aware of before the protective sweep.

Resolution of defendants' second argument, that officers coerced Williams' consent by telling him his house would be sealed and he would not have access to it while they obtained a warrant, would require the resolution of a factual dispute if such a statement would render Williams' consent involuntary. Williams claimed that an officer told him that he needed to sign a document in order for them to take the marijuana or the property would have to be secured, and he would not be able to come and go until they got a judge to sign a warrant. Juanez denied telling Williams that he could not go into his residence if he did not sign the consent to search form. Jurasek testified that he did not recall Juanez telling Williams "If you don't sign, we have to try and get a search warrant." If it were necessary, the court would credit the officers over Williams on this issue. This determination is based on both the manner and demeanor of the witnesses while testifying at the hearing and on Williams' credibility problems, including his obvious bias in favor of his long-time friends, and the fact that he owed Neely money.

However, even if officers did tell Williams that they intended to obtain a warrant if he did not consent to a search of his home, such a statement would not render Williams' consent involuntary. The Seventh Circuit has held that "baseless threats to obtain a search warrant may render consent to search involuntary [but] when the expressed intention to obtain a warrant is genuine, . . . and not merely a pretext to induce submission, it does not vitiate consent to search." United States v. Hicks, 539 F.3d 566, 571 (7th Cir. 2008) (quotation and alteration marks omitted). In this case, the police knew for certain that there was 505 pounds of marijuana in the Rose Avenue residence. "[S]ecuring a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." Segura v. United States, 468 U.S. 796, 810 (1984). Therefore, any statement to Williams that they would obtain a warrant was a genuine expression of that intent and not a pretext to induce consent. Because the court has rejected defendants' arguments in support of their contention that Williams' consent was involuntary, their motions cannot be granted on that basis.

### III. CONCLUSION

For the reasons stated above, defendants' motions to quash arrest and suppress evidence are denied.

---

1. Officers later determined that Neely was the owner of 3801½ Crowley Street, Rockford, IL.

2. The court notes that quashing defendants' arrests could only result in suppression of items seized from defendants' persons. Even if the court concluded that defendants were arrested after the officers illegally entered the Rose Avenue residence, this conclusion would not require suppression of the marijuana because it was not discovered as a result of the protective sweep but, rather, was recovered pursuant to the owner's consent to a search of the residence. See Wayne R. Lafave, 1 Search and Seizure: A Treatise on the Fourth Amendment § 1.9 (4th ed.

2008) (explaining that while an unlawful arrest certainly violates the Fourth Amendment, the exclusionary rule only comes into play when evidence is seized as a result of the unconstitutional arrest and it is generally accepted that the illegal arrest does not affect the power of the government to proceed with the prosecution); <u>United States v. Smith</u>, 108 F. App'x 402, 404-05 (7th Cir. 2004) (noting that, whether or not an initial entry is lawful, suppression is warranted only where evidence is seized illegally); <u>Guzman-Flores v. United States Immigration & Naturalization Serv.</u>, 496 F.2d 1245, 1247-48 (7th Cir. 1974) (stating that the remedy for an unconstitutional arrest is a civil action for false arrest and false imprisonment and no authority has applied the exclusionary rule to require termination of the prosecution).

3. Detective Reffett testified that the value of cannabis can range from $500 to $4,500 per pound and that "[t]he average cannabis that we're seeing lately is right around a thousand dollars a pound to $1500 a pound."